DECAL PRODUCTS CO. ET AL. *v.* UNITED STATES

No. 4748—*Pro forma* invoice dated Breslau, Germany, September 27, 1937, etc.
      Entered at New York October 18, 1937, etc.
      Entry Nos. 91686, etc.

(Decided March 4, 1940)

*Strauss & Hedges* (*Barnes, Richardson & Colburn*, associate counsel, *Albert McC. Barnes* and *J. Bradley Colburn* of counsel) for the plaintiffs.
*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the defendant.

KINCHELOE, Judge: The merchandise involved in these appeals to reappraisement, all of which were consolidated for the purposes of trial by consent of the parties, consists of certain ceramic prints or decalcomanias imported from Germany during the years 1936, 1937, and 1938.

At the outset of the trial counsel for the respective parties entered into a stipulation, wherein it was agreed, in substance, as follows:

(1) That certain decalcomanias are sold and freely offered for sale to all buyers in the ordinary course of trade in the usual wholesale quantities of 50 sheets in the principal markets of Germany, for home

consumption and for export to countries other than the United States, at prices which were at the times of exportation of the instant merchandise the same as the appraised values of the decalcomanias covered by the appeals to reappraisement involved herein, and that such appraised values constitute the dutiable foreign values if I find that foreign value is the proper basis of appraisement for the merchandise at bar.

(2) That certain other decalcomanias, not identical with those just referred to, but which are the subject of the importations covered by the appeals to reappraisement before me, are and were at the times of exportation of the instant merchandise sold and freely offered for sale in Germany to all purchasers in the ordinary course of trade, in the usual wholesale quantities of 2,000, in the principal markets of Germany, but only for exportation to the United States at prices which are and were at the times of such exportations the same as the unit entered values, or the importers' claimed unit values on the items to which the importers added on entry because of advances made by the appraiser, plus cases and packing as invoiced, and that such values constitute the dutiable export values, if I should find that export value is the proper basis for appraisement of the instant merchandise.

By virtue of said stipulated facts the issue before me has been narrowed to the sole question whether the decalcomanias sold or freely offered for sale in Germany for home consumption or for export to countries other than the United States are similar, within the meaning of that term for the purposes of finding dutiable value as used in section 402 of the Tariff Act of 1930, to the decalcomanias covered by appeals to reappraisement before me.

All of the evidence introduced herein was offered by the plaintiffs. Defendant offered nothing to support its contention, but was satisfied to submit its case after moving to dismiss the instant appeals on the ground that plaintiffs had failed to make out a *prima facie* case.

The proof introduced by plaintiffs is very complete and thorough in detail. In addition to documentary evidence and the oral testimony of witnesses, there were also offered and admitted in evidence as illustrative exhibits pieces of decorated ware showing the results after applying the different types of decalcomanias under manufacturing conditions here and in Germany.

The documentary evidence before me consists of seven affidavits, three of which are from manufacturers of decalcomanias in Germany, and four from managers of German factories that manufacture porcelain and use decalcomanias in the process of producing such ware.

The three affidavits of German manufacturers of decalcomanias, which were admitted in evidence as Collective Exhibits A–1, A–2, and A–3, are affidavits from the owners or managers of the exporting firms

of the merchandise at bar, all of whom testified they are thoroughly familiar with the manufacture of decalcomanias in Germany. It appears from said affidavits that there are two types of decalcomanias manufactured in Germany to wit, a so-called simplex type, which is manufactured for use in Germany and which will hereinafter be referred to as the "German type of decalcomania," and a so-called duplex type, which is manufactured exclusively for export to the United States, and which hereinafter will be referred to as the "American type of decalcomania." Said affidavits further disclose that both types of decalcomanias differ in their essential characteristics; that the so-called German type is made on what is known as simplex or meta paper, which is a special German-manufactured paper with an adhesive coating; that the so-called American type is made on English duplex paper, which is a specially made paper imported from England, under governmental regulations, for the sole purpose of manufacturing decalcomanias for export to the United States, consisting of two sheets, an upper sheet, which is thin and transparent and carries a thin adhesive layer which serves at the same time as a support or carrier of the color and on which the design is printed, and a lower sheet, which is known as the backing and consists of heavy paper or matrix. The colors used in the German decalcomanias are hard colors containing little or no flux (an average of 1 per centum), and are capable of withstanding a firing temperature of from 750 degrees, Centigrade (1,382 degrees, Fahrenheit), to 850 degrees, Centigrade (1,562 degrees, Fahrenheit), without burning or scorching. The colors used in the American type decalcomanias are soft colors containing an average of 10 per centum flux to allow them to fire satisfactorily at a firing temperature not to exceed 700 degrees, Centigrade (1,292 degrees, Fahrenheit). It further appears from said affidavits that all of the materials used in the production of the German type of decalcomanias are required, by a decree issued by the German Government in 1935, to be made entirely of German materials; and that the English duplex paper and the colors used in the American type of decalcomanias may be imported only with permission of the German Government and with the understanding that they are to be used in the manufacture of decalcomanias for exportation to the United States. Said affiants further testified that each of the two different types of decalcomanias are specially adapted for use in the market where they are sold; that they never successfully sold the German type of decalcomania to customers in the United States; and that the American type of decalcomania cannot be used for the decoration of pottery manufactured in the German market. Samples of both types of decalcomanias are attached to all of said affidavits, the American type of decalcomanias attached thereto having been properly identified by the appraiser as representative of the merchandise at bar.

In each of the four affidavits, Collective Exhibits B, C, D, and E, herein, from German porcelain manufacturers, the affiant has described the method of transferring the German type of decalcomania to porcelain under factory operations applied in Germany. The description is substantially the same in each of said affidavits. Such description as set forth in the affidavit of Herman Rudolph, manager of the porcelain factory of C. Tielsch & Co., Collective Exhibit B, is as follows:

> The sheet of ceramic color prints used is covered with a varnish, a so-called transfer varnish, and after this varnish has reached a certain consistency, it is transferred to the porcelain. The piece of porcelain itself is also coated with transfer varnish prior to the printing. The transferred sheet is thoroughly moistened with a sponge until the paper which is the carrier of the decoration, separates and the color now adheres to the porcelain article. Thereupon the residue of gum still adhering to the porcelain article is removed by careful washing and rinsing and the porcelain article is set aside to dry. These porcelain articles which are then ready for baking, are caused to fuse in a so-called muffle furnace at a temperature up to 850° C.

The testimony in each of said affidavits is cumulative to the effect that the American type of decalcomanias cannot be used in the German market because the colors used in such decalcomanias will not withstand the high baking or firing temperature employed in German plants manufacturing porcelain. In support of such testimony and to show the practicability of using both the American type of decalcomania and the German type of decalcomania, there are attached to each of said affidavits five plates to which were transferred certain decalcomanias of both of said types.

The oral testimony of six witnesses was also offered on behalf of plaintiffs. Three of said witnesses were connected with the plaintiffs herein, and three were the managers of the decorating departments of the three largest manufacturers of pottery in the United States and users of decalcomanias.

The first witness called was Alfred Duhrssen, president of Decal Products Co., one of the plaintiffs herein, whose business is the manufacture and importation of decalcomanias that are used for decorating pottery and earthenware manufactured in the United States. Said witness testified that he has been engaged in said business for a period of 20 years; that except on two occasions he has, during that entire period, made annual trips to Germany; that during said visits he went to factories where he saw decalcomanias manufactured and made them himself; that he is thoroughly familiar with the manufacture of decalcomanias in Germany; and that the exporters of the instant merchandise are the principal manufacturers of decalcomanias in said country. Concerning the types and character of decalcomanias manufactured in Germany, said witness' testimony is

corroborative of the statements in connection therewith contained in the affidavits, Collective Exhibits A–1, A–2, and A–3. Said witness further testified that the German type of decalcomania would not be accepted by customers in the United States on an order for the American type of decalcomania; and that the German type of decalcomania is not marketable in this country because it is not adaptable for transfer on the ware manufactured by American potteries.

Said witness further stated that approximately 80 per centum of the pottery manufacturers in this country that use decalcomanias are located in the East Liverpool District in Ohio; that he has visited all of said plants at least once a month for the period of 19 or 20 years that he has been in business; that during such visits he has observed their factory methods in applying decalcomanias, talked with people in said plants, and personally applied decalcomanias to ware; and that he is therefore familiar with the factory methods in said plants for decorating pottery with the use of decalcomanias. Said witness described the method of using decalcomanias on pottery by American potteries as follows:

When the American potteries want to decorate ware, they take duplex paper sheets and strip this thin film from the backing, and they take anywhere from 30 to 50 sheets and superimpose them on each other. So they can cut from 30 to 50 or 60 sheets at a time. The ware to be decorated is then coated with a thin film of varnish. It goes through a process where one girl puts on the varnish and the ware passes through a tunnel with a fan in it, where the varnish is dried sufficiently so the next girl, who had a bundle of 30 to 50 of these sprays cut out, places the decalcomania on the ware where this varnish has been applied, and its passes along on a belt to the next girl who has a rubbing brush, who rubs the decalcomania in position. And from there it goes in the machine washer and drier, also a conveyor system so that when it comes out of the washing and drying machine, it is ready to be put in the kiln for firing.

Differentiating the method of transferring the German type of decalcomania as employed in the German market from that used in this country in transferring the American type, said witness testified as follows:

In Germany, the girl is given one of these single paper sheets and she covers it with varnish, and sometimes she also varnishes the ware to which this is to be applied and then takes the sheet and cuts one individual design and places it on the ware herself. And she takes a sponge with some water and then soaks the paper until it comes off, and then smooths over the varnish again with clean water and sets it aside to dry. The most outstanding difference is the fact that the sheet is varnished instead of the ware being varnished as we do in this country, and then the fact they cut one design at a time which is a slow process whereas we have a mechanized process in this country.

Said witness further testified that he has taken samples of the German type of decalcomania to American potteries where they were tested but found to be unserviceable under the manufacturing conditions employed in said plants.

On cross-examination counsel for the defendant interrogated said witness concerning the use of certain so-called German duplex paper on decalcomanias imported here. Such testimony, however, in my opinion, has no materiality herein since it was shown that said German duplex paper decalcomanias were imported into this country only for a limited time which was prior to the period covered by the importations in question; and that it was then only when German manufacturers were unable to get any of the English duplex paper, which is the class required by American potteries and which is set forth in orders for American type decalcomanias.

The second witness who appeared herein was Albert Pickin, president of Palm, Fechteler & Co., another of the plaintiffs herein. Said witness testified that he has been engaged in the decalcomania business for 40 years; that during the regular course of his business he has made trips to Germany for the purpose of buying decalcomanias; that during such visits he has gone to the plants of German manufacturers of decalcomanias; and that as a result of such visits he has become familiar with the processes of German manufacturers of decalcomanias. Said witness' testimony with respect to the types of decalcomanias manufactured in Germany, the materials used in each type, and their method of manufacture, agreed with that along the same line of the previous witness. This witness further testified that his customers in the United States when ordering decalcomanias specify that they must be on English duplex paper; and that the colors must be soft and suitable for firing at a temperature not to exceed 1,350 degrees, Fahrenheit. He further stated that such specifications are set forth in orders transmitted by his company to the German manufacturers; and that a delivery of German type decalcomanias would not be accepted as a good delivery under an order for American type decalcomanias setting forth the above-mentioned specifications. The witness further testified that the grade of ware used in the United States is such that it will not fuse with decalcomanias which are fired in excess of 1,350 degrees, Fahrenheit; that the glaze will fade out; that the maximum heat that American ware will take in firing decalcomanias is 1,350 degrees, Fahrenheit; and that such limitation in firing temperature necessitates the use of colors containing a relatively high percentage of flux. His testimony as to the result which would be obtained if an American type of decalcomania were fired at a temperature in excess of 1,350 degrees, Fahrenheit, is as follows:

R Q. What would happen in the transfer of a decal of the type demanded of you by your trade if the ware were fired at a higher temperature than 1350 degrees, Fahrenheit?—A. All the brilliancy would be gone. All the colors would disappear. It would make the pattern weak looking.

R Q. Would that result produce a salable, commercial article?—A. No.

Plaintiffs' witness Dugan, secretary and treasurer of R. Gaertner & Co., also one of the plaintiffs herein, merely identified the samples of American type decalcomanias attached to the affidavits, Collective Exhibits A–1, A–2, and A–3, as representative of the merchandise covered by the appeals to reappraisement under consideration in which his company appears as plaintiff.

The next witness who appeared on behalf of plaintiffs was Ray Brookes, head of the decorating department of Homer Laughlin China Co., the largest manufacturer of pottery in the United States. Said witness testified that he has been engaged in the pottery business for 29 years, and that he orders all the decalcomanias used by his company. His testimony with respect to the method of transferring decalcomanias to decorated ware agreed with the description given by the witness Duhrssen. Said witness further testified that American type of decalcomanias require soft colors containing a certain percentage of flux; that the German hard colors "simply would not be fired in our furnace at the temperature we are allowed to give to our soft glaze"; that the colors insisted upon are those that will mingle or integrate with the glaze of his company's decorated ware; that the maximum temperature at which the decorating kilns in his plant are fired is 1,330 degrees, Fahrenheit; that such limitation in firing temperature is necessary for the colors in the decalcomanias to properly fuse with the glaze on the ware produced by his company; and that the application of a greater heat to the ware would cause what is known as a "spit-out", thereby causing the glaze to bubble and give it a sandpaper texture which would render it unmarketable as a commercial product.

The witness further testified that he received samples of German type decalcomanias from those attached to the affidavits, Collective Exhibits A–1, A–2, and A–3; and that he attempted to use said samples in his plant under factory conditions that exist when transferring American type decalcomanias in the manufacture of their decorated ware. He described his use of said samples as follows:

After we had applied the varnish to the ware and it became tacky enough to accept the print, we used the simplex paper and in putting it on, it would not stay. In other words, when we take the duplex paper and put it on, it stays and adheres to the varnish, while with the use of this simplex paper it would not stay down, and in doing that it mutilated the print to some extent, and in rubbing we had to rub it harder to make it adhere to the ware, and in the washing process, it would not release from the ware.

He further stated that after he had developed the German type decalcomanias on the ware he found that they were under fired; that the colors were dull and faded; that "the colors would not mingle with the glaze so it is blistered and it has become faded"; and that

the resultant product was not of marketable quality. To substantiate his oral testimony, the witness produced nine pieces of earthenware, which were admitted in evidence as Collective Illustrative Exhibits K–1 to K–9, inclusive, to which had been transferred both German type and American type decalcomanias under his decorating department's normal operating conditions. He identified certain of the two types of decalcomanias on said illustrative exhibits, and pointed out defects in the German decalcomanias as they transferred to the ware and compared them with the satisfactory and marketable quality of the ware with the American type of decalcomanias transferred thereon. The witness further testified that he has been in the plant of practically every pottery manufacturer in the United States; that he has observed the process of manufacture in each plant; that the process of manufacture is substantially the same in all of them; and that the process of manufacture employed in his plant is practically the same as that used in the other plants.

The witness was shown the samples of decorated ware attached to the affidavits of the German manufacturers, Collective Exhibits B, C, D, and E, with American type decalcomanias that were transferred under factory conditions prevailing in Germany. After examining the same, he stated that all of said American type decalcomanias were over fired; that "the colors have been completely or practically burned away"; and that they are not commercial marketable products.

The last two witnesses who testified on behalf of plaintiffs were also managers of the decorating departments of their respective companies. The witness, Margaret O. Parker, stated that for 17 years she has been head of the decorating department of Taylor, Smith & Taylor, one of the largest manufacturers of pottery in the United States; the witness, Robert H. Dietz, testified that for 15 years he has been foreman of the decorating department of Edwin M. Knowles China Co., large manufacturers of dinnerware. Both of said witnesses' qualifications are comparable with those of the witness, Brookes, who immediately preceded them; and their testimony concerning the quality of decalcomanias used by them, the conditions under which they are applied, and the requirements for the ware manufactured by them, is practically the same as the testimony offered by said witness Brookes. Each of said witnesses produced samples of decorated ware to which had been transferred samples of both types of decalcomanias, and in identifying the different types they supported their previous testimony concerning the impracticability of using German type decalcomanias under factory conditions employed in the production of American ware. Since their testimony is largely cumulative of that offered by

the witness Brookes, I deem it unnecessary to set forth any further analysis of same.

In his brief, counsel for defendant contends that plaintiffs have failed to establish the absence of a foreign value for similar merchandise. Such argument, in my judgment, is wholly untenable, in view of the stipulation entered into between the parties, as hereinbefore set forth. Depending on whether or not I find the imported American type of decalcomanias similar to the German type, there is concededly before me a proper dutiable foreign value, as represented by the appraised values, or a proper dutiable export value, as represented by the unit entered values, or the importers' claimed unit values on the items to which the importers added on entry because of advances made by the appraiser, plus cases and packing as invoiced. As previously stated, the sole question presented for my determination is whether the merchandise at bar, which, it is admitted, is manufactured exclusively for export to the United States, is similar within the statutory use of said term in said section 402, to the comparable merchandise of Germany. And counsel for defendant so agreed at the trial when he said, "the whole question is on similarity."

It is not disputed that both the American decalcomania and the German type are ultimately used for the same purpose, to wit, for transferring patterns on earthenware or chinaware to decorate such ware. But such fact, of itself, is not determinative of the similarity of both types of merchandise for the purposes of this case. Ample authority for that conclusion is found in the decision of the Court of Customs and Patent Appeals in the case of *United States* v. *Kraft Phenix Cheese Corp. et al.* (26 C. C. P. A. 224, C. A. D. 21). The question presented in that case was whether certain imported Roquefort cheese known as "Portion" Roquefort was similar, for appraisement purposes, to so-called "Standard" Roquefort that was sold in the foreign market. The court held that although both kinds were ultimately used for the same purpose—both are eaten as Roquefort cheese—they, nevertheless, were not similar within the meaning of the word "similar" in section 402 (c) of the Tariff Act of 1930. In reaching its conclusion, the court said:

It is conceded that "Standard" and "Portion" Roquefort cheese are made of the same materials. However, there is evidence to show that there is a difference in the method by which they are made. The record shows that the different cheeses are subjected to different degrees of heat. In addition, there is a difference in the salting, cave temperature, mould scraping and length of time in the curing process. The record for appellees shows that this difference of treatment results in a different kind of cheese. This conclusion is logical. The same initial materials may be used in the manufacture of many different things, the difference in the resulting product being caused by the varying treatment to which the materials have been subjected.

There is strong evidence that the "Standard" type crumbles when cut and that all Roquefort cheese shipped to this country must be capable of being cut into portions.

In a broad sense, of course, the ultimate use of both types may be said to be the same. They are both eaten as Roquefort cheese. But there is testimony to the effect that "Portion" cheese is made so that it may be cut satisfactorily and that otherwise it could not be used to make up portion packages.

As to adaptability to the same use, appellees' proof shows that the Standard Roquefort is not adapted to use or purpose for which "Portion" Roquefort was specially prepared after long research, i. e., capability of being smoothly cut.

The reasoning applied in the cited case may be applied with equal force in the instant case. Here, it is established of record that the initial materials used in both types of decalcomanias are the same, to wit: paper and colors. But the evidence is strong that the English duplex paper used in the American type of decalcomania is widely different from the simplex or meta paper used in the German type. Likewise, the soft colors used in the American type are materially different from the hard colors used in the German type. In my judgment the record before me is convincing that the German type of decalcomania is manufactured of certain German materials to suit manufacturing conditions in the home market, and the American type is manufactured of entirely different materials prepared in a definite way to meet the requirements of the pottery industry in this country.

In its decision in the *Kraft Phenix Cheese Corp.* case, *supra*, the court cited with approval the case of *United States* v. *Irving Massin & Bros.* (16 C. C. P. A. 19, T. D. 42714). In the latter case, the court construed the word "similar" as it is used in said section 402 as follows:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b).

Said rule was followed in later decisions involving the question of similarity, for appraisement purposes, of imported merchandise with comparable merchandise in the foreign market. *United States* v. *Wecker & Co.* (16 C. C. P. A. 220, T. D. 42837); *Scharf Bros. Co.* v. *United States* (16 C. C. P. A. 347, T. D. 43089); and *Meadows, Wye & Co. Inc.* v. *United States* (17 C. C. P. A. 36, T. D. 43324).

Applying said rule, as laid down in the *Massin* case, *supra*, to the instant case, it is my opinion that the American type decalcomanias covered by the appeals to reappraisement under consideration are not similar to the so-called German type of decalcomanias. In my judgment it is fairly established by the uncontradicted evidence herein that both of said types of decalcomanias are comprised of specially

made materials; that the materials used in each type are essentially different; and that the materials employed in each type are particularly selected to render the respective articles available as commercial products in the market where the individual type is sold. The German simplex paper and the German hard colors used in the German type decalcomanias make such articles particularly fitted for factory operations as they prevail in the German market. The English duplex paper, demanded by American pottery manufacturers, is used in the American type of decalcomanias to suit what the witness referred to as the "mechanized process" of transferring decalcomanias to decorated ware that is employed in this country, and are not adaptable for use in the slower process followed by the German manufacturers. The soft colors, containing approximately 10 per centum flux, used in the American type decalcomanias, are specially prepared to suit the firing temperature applied to the decorating kilns in American plants so that the colors will properly fuse with the glaze on American ware. It is clear from the record before me, in my judgment, that the American type decalcomania is adaptable for use and is actually used only by American manufacturers of pottery in this country; that said type cannot be used in the manufacture of decorated ware in German factories; that the German type decalcomania is used exclusively in the German market in connection with the manufacture of decorated ware; and that said type is not susceptible of use and will not be accepted by manufacturers of such ware in this country.

The case on which defendant chiefly relies to support its contention that the imported merchandise is similar, for the purposes of this case, with the comparable product sold in the foreign market is the case of *United States* v. *Thomas* (21 C. C. P. A. 254; T. D. 46788). There, the merchandise involved consisted of certain paper tubes with corrugated rings, and bobbins of slightly varying diameters, used to hold yarn during the spinning, twisting, or warping processes in the textile industry. In holding said merchandise to be similar, for appraisement purposes, to comparable goods in the country of exportation, the court in said case stated.

Now, in the case at bar, we think the goods are composed of the same material, made in substantially the same way, and it is fair to assume that their cost of production does not materially vary by reason of the taper or corrugations. While the record shows that certain American manufacturers and Czechoslovakian manufacturers could not use on their particular spindles tubes having a taper not designed to fit the spindle of their machines, and that they would not accept as a compliance with their orders, tubes made with a taper which did not fit, it also is shown that others, there and here, could use tubes with such a taper, and when used, all were used for the same purpose; that each of the compared articles is made from the same material, by the same processes, and when finished has no

material differences which would render them dissimilar for valuation purposes. Whether goods sold in the foreign market are similar to those imported cannot always depend upon whether the foreign goods would be accepted as a compliance with an order by the user of the imported goods. That test might require that the goods be identical and the requirement of the statute is only that the goods be similar. Certainly the equality in value and similarity in cost of production, under the circumstances of this case, were very pertinent and material considerations in determining similarity.

The facts established herein do not, in my judgment, warrant a conclusion like that reached in the *Thomas* case, *supra*. There, the court found that the merchandise was made of the same materials, made in substantially the same way, the cost of production did not materially vary, and, to a certain extent, both classes were interchangeable in use. Here, the evidence is conclusive, as I view it, that the materials used in each type of decalcomania involved herein are entirely different; and that the use, and adaptability for use of each type, is materially different.

The evidence before me with respect to the cost of production of the merchandise under consideration is very meager. The only testimony relating to cost of production was that elicited from the witness Duhrssen in cross-examination by counsel for defendant. On that point, said witness testified that simplex or meta paper used in the German type of decalcomanias costs 76.25 reichmarks per 1,000 sheets, and the English duplex paper used in the manufacture of American type of decalcomanias costs 95 reichmarks per 1,000 sheets. Reducing the difference to a per sheet basis it amounts to 1⅞ pfennig. Nothing was offered to show comparable costs of the different colors used in both types of decalcomanias.

It will be observed that in the *Thomas* case, *supra*, the court found:

\* \* \* equality in value and similarity in cost of production, *under the circumstances of this case*, were very pertinent and material considerations in determining similarity. [Italics mine.]

In the case of *United States* v. *Vietor & Achelis* (17 C. C. P. A. 412, T. D. 43864) the sole reason for holding goods dissimilar was because their values were different. In the case of *Scharf Bros. Co., Inc.* v. *United States* (16 Ct. Cust. Appls. 347, T. D. 43089) a difference in cost of production was not permitted to be a bar to a finding of similarity. From the decisions in said three cases it seems clear that, while equality in value and similarity in cost of production may be elements to be considered in determining similarity of merchandise for appraisement purposes, the facts and circumstances in each individual case determine the pertinency and relative materiality of such elements. As stated in the *Thomas* case, *supra*, "goods might be interchangeable in one sense and yet not be interchangeable or similar in a dutiable sense."

In view of the uncontradicted evidence in the instant case, it is my opinion that relative values and comparable costs of production of both types of decalcomanias under consideration have little bearing, if any, toward a proper determination of the present issue.

For the reasons hereinabove set forth, and following the principles enunciated in the cited authorities, it is my opinion that the imported merchandise covered by the appeals to reappraisement in question is not similar, within the meaning of that term as it is to be applied in finding dutiable value under the provisions of section 402 of the Tariff Act of 1930, to the comparable merchandise sold, or freely offered for sale, in the foreign market. The motion of counsel for defendant to dismiss said appeals is accordingly denied, and an exception to said ruling is allowed said counsel.

On the basis of the record before me, I find as matter of fact:

(1) That the merchandise in question consists of certain ceramic prints or decalcomanias imported from Germany during the years 1936, 1937, and 1938.

(2) That there was no foreign value, as such value is defined in section 402 (c) of the Tariff Act of 1930, for such or similar merchandise.

(3) That the proper basis of appraisement for said merchandise is export value, as such value is defined in section 402 (d) of said act.

(4) That said merchandise was at the time of exportation thereof sold and freely offered for sale in Germany to all purchasers in the ordinary course of trade, in the usual wholesale quantities of 2,000, in the principal markets of Germany, for exportation to the United States at the unit entered values thereof, or the importers' claimed unit values on the items to which the importers added on entry because of advances made by the appraiser, plus cases and packing as invoiced.

(5) That the proper dutiable export values of said merchandise are the values set forth in finding of fact (4).

I therefore hold as matter of law that the proper basis for appraisement of the ceramic prints or decalcomanias covered by the appeals to reappraisement in question is export value, as such value is defined in section 402 (d) of the Tariff Act of 1930; and that such export values are the unit entered values, or the importers' claimed unit values on the items to which the importers added on entry because of advances made by the appraiser, plus cases and packing as invoiced. Judgment will be rendered accordingly.